FILED
Clerk
District Court
OCT 13 2026
for the Northern Mariana Islands
By __________ (Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

LEO BORJA TUDELA,

Plaintiff,

v.

COMMONWEALTH PORTS AUTHORITY,

Defendant.

Case No. 1:26-cv-00005

**DECISION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS COMPLAINT**

Before the Court is Defendant Commonwealth Ports Authority's Motion to Dismiss (ECF No. 8), filed on May 29, 2026, as corrected by its Notice of Errata (ECF No. 9). In its Motion, the Commonwealth Ports Authority (CPA) moves for dismissal of Plaintiff Leo Borja Tudela's Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Mr. Tudela filed his Opposition (ECF No. 12) on June 26, 2026; CPA filed its Reply (ECF No. 15) on July 20, 2026. The Court held a hearing on CPA's Motion on October 7, 2026, before taking the matter under advisement.

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the Motion and accordingly dismisses the second count and prayer for damages for emotional distress and punitive damages in Mr. Tudela's Complaint without leave to amend.

## I. BACKGROUND

On March 30, 2026, Mr. Tudela filed a verified Complaint (ECF No. 1), naming the CPA as the sole defendant. Mr. Tudela alleged the following:

(1) Mr. Tudela is an eighty-one-year-old male who was employed by the CPA as its Executive Director from November 14, 2023, to December 18, 2024. (Compl. ¶ 7, ECF No. 1.) His duties as Executive Director "were to manage the day-to-day operation of all the airports and seaports of the Commonwealth." (*Id.* ¶ 12.)

(2) Mr. Tudela previously worked at the U.S. Postal Service for forty-two years, including time as the Asia Manager and Director of the Asia Pacific Region and as Vice President of the Southeast Region. (*Id.* ¶¶ 9, 11.) As Vice President, he supervised 92,000 employees in operations across five states with a budget of $3.57 billion annually. (*Id.* ¶ 9.) In addition, he has prior aviation experience with Hawaiian Airlines and served in the U.S. Army for six years during the Vietnam War. (*Id.* ¶¶ 10, 11.)

(3) During the process of considering and ultimately hiring Mr. Tudela as CPA's Executive Director, a member of the selection committee commented that Mr. Tudela "was too old." (*Id.* ¶ 14.) After being hired, Mr. Tudela's age was still the subject of comments among members of the CPA board of directors, including one off-the-record comment by then-CPA board chairman Ramon Tebuteb at a CPA board meeting. (*Id.* ¶ 15.)

(4) On October 25, 2024, Mr. Tebuteb requested to meet with Mr. Tudela. (*Id.* ¶ 16.) At the meeting, Mr. Tebuteb asked about Mr. Tudela's age before telling him to submit a thirty-day notice of resignation or face a thirty-day notice of termination. (*Id.*; *see also id.* ¶ 17 (alleging that Mr. Tebuteb "pointed his finger at [Mr.] Tudela and took a[] very aggressive posture").) When Mr. Tudela asked for a reason as to why he should submit his resignation, Mr. Tebuteb stated that Mr. Tudela "was not up to par" and did not provide any "specifics." (*Id.* ¶ 18.)

(5) Mr. Tudela subsequently resigned as CPA's Executive Director "under pressure and duress" because of Mr. Tebuteb's "highly offensive and demoralizing" treatment of him. (*Id.* ¶¶ 19-20). Mr. Tebuteb sought to replace Mr. Tudela with a candidate "who was almost 40 years younger" than him, notwithstanding Mr. Tudela's achievements and high performance as Executive Director. (*Id.* ¶ 22; *see also id.* ¶ 12 (listing "multiple accomplishments" as Executive Director); *id.* ¶ 23 (alleging that Mr. Tudela was ultimately replaced by a candidate "close to 20 years younger than he was" because Mr. Tebuteb's intended candidate turned down employment on salary grounds).)

(6) Mr. Tudela subsequently filed a "charge of age discrimination" with the Equal Employment Opportunity Commission (EEOC). (*Id.* ¶ 25.) On December 31, 2025, the EECO issued a Notice of Right to Sue. (*Id.* ¶ 27.)

Mr. Tudela brings two causes of action against the CPA. First, he alleges that the CPA wrongfully terminated him as Executive Director in violation of the federal Age Discrimination in Employment Act ("ADEA," 29 U.S.C. §§ 621 *et seq.*). (*Id.* ¶¶ 25-29.) Second, he alleges that the CPA constructively discharged him in violation of "public policy, equal protections laws," and Title VII of the Civil Rights Act of 1964, as amended. (*Id.* ¶¶ 30-31.) As to his prayer for relief, Mr. Tudela seeks "[f]ront pay for the years that [he] would have worked but for CPA's discriminatory treatment if reinstatement is not awarded[,]" "[a]ll backpay and fringe benefits from the date of wrongful termination" and prejudgment interest, statutory liquidated damages, compensatory damages, injunctive relief, and attorneys' fees and costs. (*Id.* at 5-6 (prayer for relief).)

The CPA first appeared through the April 23, 2026, filing of a stipulation requesting additional time to respond to Mr. Tudela's Complaint. (*See* Stip. to Extend Time, ECF No. 4.)

After the case was reassigned in view of the Hon. Ramona V. Manglona's self-recusal (*see* Order of Self-Recusal, ECF No. 5; General Designation of a District Judge, ECF No. 6), the Court granted the stipulation on May 4, 2026.

The CPA filed its Motion to Dismiss (ECF No. 8) on May 29, 2026, before filing corrected versions of its motion (ECF No. 9-1) and supporting memorandum (ECF No. 9-2) on June 1, 2026.[1] The Court subsequently granted a stipulation extending the time for Mr. Tudela to file an opposition. Mr. Tudela filed his Opposition (ECF No. 12) on June 26, 2026; the CPA filed its Reply (ECF No. 15) thereto on July 20, 2026. The Court calendared the Motion for a hearing, which hearing was ultimately held on October 7, 2026. At the hearing, the Court heard arguments from the Parties before taking the matter under submission. (Mins., ECF No. 18.)

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may seek dismissal of a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" where there is sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) ("In addition to providing fair notice, the complaint's allegations must . . . suggest that the claim has at least a plausible chance of success."). A plaintiff need not set forth "detailed factual allegations," but must plead

[1] The only corrections were (1) amending the title to reflect that the CPA was moving for dismissal only under Rule 12(b)(6) of the Federal Rules of Civil Procedure and (2) the addition of line numbers. (Notice of Errata 2, ECF No. 9.) The Court cites to the corrected Motion to Dismiss (ECF No. 9-1) and Memorandum (ECF No. 9-2) as the operative motion papers here.

"more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted) (rejecting "labels and conclusions," "formulaic recitation of the elements of a cause of action," and "naked assertions devoid of further factual enhancement" (internal quotation marks and brackets omitted)).

In deciding a motion to dismiss, the Court must "accept as true all well-pleaded factual allegations, and construe all factual inferences in the light most favorable to the plaintiff." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020). "The [C]ourt need not, however, . . . accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." *Beckington v. Am. Airlines, Inc.*, 926 F.3d 595, 604 (9th Cir. 2019) (internal quotation marks omitted).

## III. DISCUSSION

The CPA contends that Mr. Tudela's Complaint should be dismissed for failure to state a claim. First, the CPA contends that Mr. Tudela fails to state a claim under the ADEA because his allegations are insufficient to show an adverse employment action or a constructive discharge. (Def. CPA's Mem. in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) 5-8 [hereinafter "Def.'s Mem."], ECF No. 9-2.) Second, the CPA contends that Mr. Tudela's second count, asserting constructive discharge in violation of public policy, equal protection laws, and Title VII of the Civil Rights Act of 1964, fails to allege any independent cause of action in view of the lack of allegations that develop the elements for a cause of action under any of the asserted legal bases for a claim. (*Id.* at 9-10.) Third, the CPA contends that Mr. Tudela's prayer for damages for mental

anguish, emotional distress, and punitive damages must be dismissed because such relief is unavailable under the ADEA. (*Id.* at 10-11.)

In opposition, Mr. Tudela first contends that his allegations sufficiently establish an inference of discrimination under the ADEA. (Opp'n to Mot. to Dismiss 6-7 [hereinafter "Pl.'s Opp'n"], ECF No. 12.) Second, Mr. Tudela contends that the CPA's arguments concerning sufficiency of his allegations rest on the drawing of factual inferences against him, which is premature and inappropriate at this juncture. (*Id.* at 7-9.) Third, Mr. Tudela contends that his allegations are more than sufficient to state an ADEA claim in view of case law holding lesser allegations to be sufficient to survive dismissal. (*Id.* at 9-10 (citing *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045 (9th Cir. 2012).) Fourth, Mr. Tudela asserts that the second count of his Complaint adequately states a claim for constructive discharge and wrongful termination in violation of public policy under Commonwealth law, with the relevant public policy embodied in the ADEA, such that the second count "should be read as alleging wrongful termination in violation of public policy, with constructive discharge serving as the manner in which the termination occurred." (*Id.* at 10-12; *see also id.* at 12-13 (acknowledging that Title VII does not provide basis for age-discrimination claim and requesting leave to amend should the Court find that additional factual allegations or clarification are required to support "public-policy or equal-protection language" in second count).) Fifth, Mr. Tudela contends that his prayer for remedies not available under the ADEA should not warrant dismissal of his entire ADEA claim. (*Id.* at 13.)

In reply, the CPA first emphasizes that Mr. Tudela's allegations show isolated, off-the-record "stray remarks" insufficient to show a legally recognized adverse employment action or a discriminatory motive on the part of the entire CPA, and fall short of the allegations held to be sufficient to establish an ADEA claim in *Sheppard*. (Def.'s Reply to Opp'n to Mot. to Dismiss 3-

5 [hereinafter "Def.'s Reply"], ECF No. 15.) The CPA next contends that Mr. Tudela's claim under Commonwealth law is preempted by the ADEA, as recognized by Commonwealth law (*id.* at 6-8), and in any event, his allegations fail to establish constructive discharge (*id.* at 8-9) and are properly construed as merely supporting Mr. Tudela's first count and not setting forth an independent cause of action (*id.* at 9-10). The CPA concludes by clarifying that, as to any remedies unavailable as a matter of law, the CPA seeks dismissal with prejudice of Mr. Tudela's prayer for such specific remedies, separate and apart from whether Mr. Tudela's substantive claims should be dismissed in their entirety, "so that the parties do not waste time and money discovering them." (*Id.* at 10-11.)

**A. Count I: ADEA Claim**

The first count in Mr. Tudela's Complaint invokes the ADEA. The ADEA forbids an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[,]" 29 U.S.C. § 623(a)(1), where the individual is "at least 40 years of age[,]" *id.* § 631(a). *See also id.* § 626(c)(1) (authorizing private right of action). The Supreme Court has recognized "two theories of employment discrimination: disparate treatment and disparate impact." *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 811 (9th Cir. 2004) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)). A disparate treatment claim involves an "employer [who] simply treats some people less favorably than others because of their race, color, religion[,] or other protected characteristic." *Id.* (internal quotation marks, citations, and original brackets omitted). On the other hand, a disparate impact claim rests on "employment practices that are facially neutral in their treatment of differing groups . . . fall[ing] more harshly on one group than another and cannot be justified by business necessity." *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1049 n.1 (9th Cir. 2012) (internal quotation marks omitted). As

Mr. Tudela's Complaint does not contain allegations concerning the impact of facially neutral employment practices as applied across differing groups, Mr. Tudela's ADEA claim is properly construed as a disparate treatment claim.

"In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision." *Hazen Paper Co.*, 507 U.S. at 610. Consequently, to establish a disparate impact claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009), and may rely on circumstantial or direct evidence to make out a claim, *Sheppard*, 694 F.3d at 1049. "Direct evidence . . . is defined as evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude" that permits the inference that "the attitude was more likely than not a motivating factor in the employer's decision." *Enlow*, 389 F.3d at 812 (internal quotation marks omitted); *see also France v. Johnson*, 795 F.3d 1170, 1173 (9th Cir. 2015) (collecting cases finding direct evidence of discriminatory motive). As to a claim premised on circumstantial evidence, a complaint survives dismissal if the allegations therein establish a "straightforward" case of discrimination: that the plaintiff (1) was at least forty years old, (2) performed his job satisfactorily, (3) was terminated, and (4) such termination occurred under circumstances giving rise to an inference of age discrimination. *Sheppard*, 694 F.3d at 1050.

Here, the CPA does not dispute that Mr. Tudela's Complaint alleges that he was over the age of forty and performed his duties as CPA's Executive Director satisfactorily. (Def.'s Mem. 5; Def.'s Reply 7.) Instead, the CPA disputes whether Mr. Tudela's resignation qualifies as a termination or other adverse employment action and whether the alleged circumstances surrounding his resignation raise an inference of age discrimination. (Def.'s Mem. 5-7, 7-9.)

As to termination, Mr. Tudela does not allege that the CPA terminated him; rather, he alleges that he was "constructively terminated" and "forced to resign under pressure and duress because of Tebuteb's treatment of him." (Compl. ¶¶ 20, 21; *see also id.* ¶ 28 (alleging that Tebuteb "coerced him into quitting through threats, intense pressure, and creat[ing] an intolerable work environment").) "Where an employee quits or retires they must prove that they were constructively discharged." *U.S. E.E.O.C. v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267, 1283 (D. Nev. 2009). The Supreme Court has explained:

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

*Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citations omitted); *accord Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." (internal quotation marks omitted)). "[I]n general, a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge. . . . Hence, a plaintiff alleging a constructive discharge must show some aggravating factors, such as a continuous pattern of discriminatory treatment." *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987) (internal quotation marks and citations omitted) (collecting cases); *see also Brooks*, 229 F.3d at 930-31 (noting that standard for establishing constructive discharge is higher than the showing of "severe or pervasive harassment necessary to support a hostile work environment claim"). The Ninth Circuit has recognized, however, that "an employee

may demonstrate that the decision to resign or retire was involuntary under circumstances not involving intolerable or discriminatory working conditions":

> [A] resignation may be found involuntary if, from the totality of the circumstances, it appears that the employer's conduct in requesting or obtaining the resignation effectively deprived the employee of free choice in the matter. . . .
>
> [. . .]
>
> In evaluating such claims of coercion, we determine voluntariness by an objective standard, rather than by the employee's purely subjective evaluation; reject cases in which the employee did have a choice, even if between comparatively unpleasant alternatives; and consider additional case-specific factors that cut against a finding of coercion, such as whether the employee was given an alternative to resignation or retirement, understood the choice, had a reasonable time in which to decide, or could select the timing of the retirement or resignation.

*Knappenberger v. City of Phoenix*, 566 F.3d 936, 940-41 (9th Cir. 2009) (internal quotation marks and citations omitted).

Mr. Tudela allegations set forth that (1) a member of the selection committee "commented that he was too old" at the time he was "under consideration" to be CPA's next Executive Director (Compl. ¶ 14); (2) "comments about his age" continued after his hiring, including one instance where then-CPA board chairman Tebuteb "told a Board Member off the record that Tudela was too old" (*id.* ¶ 15); (3) Mr. Tebuteb met with Mr. Tudela in an October 2024 meeting at which he inquired about Mr. Tudela's age before aggressively requesting Mr. Tudela to submit his resignation or face a notice of termination (*id.* ¶ 16); and (4) Mr. Tudela ultimately resigned, effective December 18, 2024 (*id.* ¶ 7). Accepting such allegations as true and construing them and the reasonable inferences therefrom in Mr. Tudela's favor, *Parents for Privacy*, 949 F.3d at 1221, Mr. Tudela plausibly alleges that his resignation was a constructive discharge. Mr. Tudela was subject to an explicit demand by a decision-maker of his employer—namely, the chair of CPA's

board of directors—to resign or face termination. He was not presented with a choice between leaving the CPA (whether by resignation or termination) and any "alternative to resignation or retirement[.]" *Knappenberger*, 566 F.3d at 941. Furthermore, in addition to the explicit nature of the demand, in view of Mr. Tebuteb's alleged behavior in demanding Mr. Tudela's resignation and prior continuing series of negative remarks about Mr. Tudela's age throughout his tenure as CPA's Executive Director—whether made to Mr. Tudela directly or to other members of CPA's board of directors, *i.e.*, other decision-makers with authority over Mr. Tudela's employment—it is plausible that "a reasonable person in [his] position would have felt compelled to resign," *Suders*, 542 U.S. at 141. *See also Poland v. Chertoff*, 494 F.3d 1174, 1186 (9th Cir. 2007) (finding no constructive discharge where, *inter alia*, employee "never testified that he felt compelled or forced to resign"); *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1412 (9th Cir. 1996) (finding no constructive discharge where, *inter alia*, employee "was not encouraged to resign or retire"). Thus, Mr. Tudela has pleaded sufficient factual material to establish that his resignation qualifies as a termination or discharge within the meaning of the ADEA.[2]

As to whether Mr. Tudela's allegations raise an inference of age discrimination, the allegations indicate that Mr. Tudela's age was an open source of concern by CPA decision-makers with authority over his employment—and that at the very meeting where Mr. Tebuteb, the chair of CPA's board of directors demanded his resignation, Mr. Tebuteb immediately preceded the demand by inquiring about Mr. Tudela's age, consistent with Mr. Tebuteb's other alleged remarks also about Mr. Tudela's age prior to the meeting. At this juncture, Mr. Tudela's allegations, accepted

---

[2] The timing of Mr. Tudela's resignation, accounting for a thirty-day notice period, does not dispel the inference, accepted as true at this juncture, that he lacked "free choice in the matter," *Knappenberger*, 566 F.3d at 941, or that he found "his workings conditions so intolerable that he felt compelled to resign," *Poland*, 494 F.3d at 1185 (noting employee's continuing to work for eight months after purportedly undesirable relocation indicated that employee's conditions were not "so poor that they trumped his motivation to earn a living").

as true, *Parents for Privacy*, 949 F.3d at 1221, permit the plausible inference that "the alleged discriminatory attitude . . . was more likely than not a motivating factor" in terminating Mr. Tudela through "conduct or statements by persons involved in the decision-making process[,]" *Enlow*, 389 F.3d at 812 (internal quotation marks omitted).

The CPA's arguments to the contrary are not persuasive. First, to construe Mr. Tebuteb's age-related remarks as "stray" or "isolated" remarks is contrary to the applicable standard in evaluating a motion to dismiss for failure to state claim, namely, to accept all well-pleaded factual allegations as true and to construe all reasonable inferences in Mr. Tudela's favor. *Parents for Privacy*, 949 F.3d at 1221. Furthermore, the cases upon which the CPA relies in urging dismissal based on "stray" remarks are inapposite. *Nesbit v. Pepsico, Inc.*, 994 F.2d 703 (9th Cir. 1993), was an appeal from a grant of summary judgment; the Ninth Circuit found that *general* remarks, "uttered in an ambivalent manner and . . . not tied directly" to an employee's termination, were insufficient to create an inference of age discrimination. 994 F.2d at 705. Mr. Tebuteb's remarks here, however, are alleged to be specific to Mr. Tudela, hostile or derogatory, and tied directly to the latter's termination. Likewise, in *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912 (9th Cir. 1996), another appeal from a grant of summary judgment, the Ninth Circuit deemed a supervisor's comment about wanting to "get rid of all the 'old timers'" to be insufficient to establish that the reason for terminating an employee was pretextual. 113 F.2d at 918. As in *Nesbit*, the comment in *Nidds* was "ambiguous" and "not tied directly" to the termination, *id.* at 919, and thus is readily distinguishable from the facts alleged by Mr. Tudela here.

Second, while the CPA is correct that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive," *Bradley v. Harcourt,*

*Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996), the CPA overlooks that such a negative inference arises *after* a plaintiff is able to present a prima facie case—and Mr. Tudela need not plead a prima facie case to survive dismissal. *Sheppard*, 694 F.3d at 1050. Furthermore, the CPA ignores the plausible inference the Court must draw, *Parents for Privacy*, 949 F.3d at 1221, arising from the direct temporal proximity (namely, occurring at the same meeting) between Mr. Tebuteb's ultimate inquiry about Mr. Tudela's age and immediately succeeding demand for the latter's resignation. Even accepting *arguendo* the CPA's arguments concerning the vesting of authority over employment decisions in the CPA's board of directors, the Ninth Circuit has instructed that "even if a subordinate employee with bias was not the final decisionmaker, the plaintiff can establish a causal link by proving that 'the biased subordinate influenced or was involved in the decision or decisionmaking process.'" *France*, 795 F.3d at 1176 (quoting *Poland*, 494 F.3d at 1182). Mr. Tudela's allegations concerning Mr. Tebuteb's role in terminating him and age-related statements and conduct are sufficient to establish the inference that Mr. Tudela's termination occurred under age discriminatory circumstances.

Therefore, Mr. Tudela's Complaint states a plausible claim for relief under the ADEA. Dismissal of Mr. Tudela's first count is accordingly inappropriate.

**B. Count II: Common-Law Claim for Wrongful Discharge in Violation of Public Policy**

**1. Mr. Tudela fails to meet the requirements of Rule 8 of the Federal Rules of Civil Procedure.**

The second count of Mr. Tudela's Complaint asserts that he was constructively discharged in violation of public policy and equal protection laws. The CPA correctly highlights that Mr. Tudela "fails to even cursorily allege the elements of any separate cause of action." (Def.'s Mem. 9.) The allegations under the second count consist of two conclusory legal assertions: that Mr. Tudela "was constructively discharged because of his age, in violation of public policy, equal

protection laws[,] and Title VIII, USCA" (Compl. ¶ 30), and that the "CPA is liable to [him] for damages, including for [his] emotional distress" "[b]ecause of the unlawful termination" (*id.* ¶ 31). Such conclusory statements merely set forth "an unadorned, the defendant-unlawfully-harmed-me accusation" that is insufficient to state any plausible claim for relief. *Iqbal*, 556 U.S. at 678; *see also Gibson v. City of Portland*, 165 F.4th 1265, 1292 (9th Cir. 2026) ("In *Iqbal*, the Court warned that threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. We do not have even threadbare recitals of the elements of a cause of action here." (internal quotation marks omitted)). Mr. Tudela's reliance on *Gray v. Imperial Pacific International (CNMI), LLC*, Nos. 1:19-cv-00008 & 1:19-cv-00020, 2023 WL 3714156 (D. N. Mar. I. May 30, 2023), for the proposition that his claim is "governed by Rule 8's notice-pleading standard" (Pl.'s Opp'n 10), is misplaced. In *Gray*, this Court explained:

> "Claims for wrongful termination in violation of public policy do not need to meet a heightened pleadings standard; they are governed by Rule 8(a)'s notice pleading standard" and must then "provide fair notice of the claims so that a defendant can effectively respond." ([*Gray v. Imperial Pac. Int'l (CNMI), LLC*, No. 1:19-cv-00008, ECF No. 18, at 5 (D. N. Mar. I. Oct. 18, 2019) (order granting in part defendant's motion to dismiss)] (first citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 (9th Cir. 2008); and then citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).)

*Gray*, 2023 WL 3714156, at *8 (emphasis added). The language at the pincite for *Mendiondo* states that the "notice pleading standard" set forth at Rule 8(a) of the Federal Rules of Civil Procedure, as opposed to the heightened pleading standard set forth at Rule 9 of the Federal Rules of Civil Procedure, applied to a claim for wrongful termination in violation of the federal and California False Claims Acts. *Mendiondo*, 521 F.3d at 1100. A careful reading of the remainder of *Mendiondo*, however, reveals that the Ninth Circuit's use of "notice pleading" to describe Rule 8(a)'s pleading standard merely reflected the "default" standard, applicable to all civil cases except fraud claims subject to Rule 9, that governed *at that time*—prior to the Supreme Court's

subsequent interpretation of Rule 8(a) in *Iqbal*, decided over a year later, to contain a plausibility pleading standard. *See id.* at 1103-04. In other words, *Mendiondo* did not carve out a type of claim that would be subject to the pre-*Iqbal* interpretation of Rule 8(a)'s pleading standard. Instead, *Mendiondo* merely stands for the proposition that a claim for wrongful termination in violation of the federal and California False Claims Acts need not meet Rule 9's heightened pleading standard for fraud claims because such a claim does not require a showing of fraud. *Id.* at 1103. In any event, even if *Mendiondo* did purportedly fix the pleading standard for wrongful termination claims to be notice pleading, such a holding is contrary to the Supreme Court's decision in *Iqbal* applying "*Twombly*'s construction of Rule 8" to complaints beyond the limited antitrust context of *Twombly*. *Iqbal*, 556 U.S. at 677-80.[3]

Nor does *Starr* support Mr. Tudela's assertion about the relevant pleading standard. The pincite for *Starr* refers to the Ninth Circuit's holding that a complaint satisfied "the standard of Rule 8(a)." *Starr*, 652 F.3d at 1216. The Ninth Circuit expressly cited and applied *Iqbal* and *Twombly* in concluding that "the factual allegations in [the plaintiff's] complaint *plausibly* suggest" that the defendant was liable to the plaintiff. *Id.* (emphasis added).

As such, as with any other civil claim except those subject to Rule 9's heightened pleading standard, the applicable pleading standard for Mr. Tudela's claim of constructive discharge in violation of public policy is the plausibility pleading standard of Rule 8(a), as interpreted by *Twombly* and *Iqbal*. Mr. Tudela cannot merely name his claims or generically mention the legal

---

[3] *See also, e.g.*, *Roberts v. Inslee*, No. 24-1949, 2025 WL 3539135, at *1 (9th Cir. Dec. 10, 2025) ("Plaintiffs' 'employment torts' claim against [defendant] fails because Plaintiffs have not *plausibly alleged* any 'legal right or privilege' to refuse COVID-19 vaccination such that they were 'unlawful[ly] discharge[d],' in violation of public policy." (emphasis added)); *Whitehead v. Pacific Senior Living Mgmt. LLC*, No. 21-15035, 2022 WL 313844, at *2 (9th Cir. Feb. 2, 2022) ("Because she has not pleaded a *plausible* claim of discrimination, [plaintiff's] sex, pregnancy, and disability discrimination claims fail, and so do her derivative claims for failure to prevent discrimination under [California law] and wrongful discharge in violation of public policy." (emphasis added)).

authority for his claims; he must instead plead *some* facts to establish his claims under his second count. He has failed to do so here. Dismissal of his second count is therefore appropriate.

**2. Leave to amend is inappropriate because Mr. Tudela's claim is foreclosed as a matter of Commonwealth law.**

Whether Mr. Tudela should be afforded leave to amend his second count, however, turns on whether "it appears at all possible that [he] can correct the defect." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks omitted). The CPA contends that any amendment would be futile because a Commonwealth common-law action for constructive discharge in violation of public policy is directly preempted by the ADEA or otherwise not cognizable under principles of Commonwealth law due to the availability of relief under the ADEA. (Def.'s Reply 6-7.)

As to direct preemption, the CPA relies on *Ahlmeyer v. Nevada System of Higher Education*, 555 F.3d 1051 (9th Cir. 2009), and the ADEA's lack of language akin to Title VII's anti-preemption clause set forth at 42 U.S.C. § 2000e-7. (*Id.*) Though *Ahlmeyer* indeed holds that the ADEA "is the exclusive remedy for claims of age discrimination in employment," 555 F.3d at 1060-61, the Ninth Circuit there addressed preemption in the context of whether the ADEA preempted other *federal* remedies, specifically an action under 42 U.S.C. § 1983 claiming age discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, *id.* at 1054. The discussion in *Ahlmeyer* thus canvassed case law, *id.* at 1056-57, and the structure and comprehensiveness of the ADEA as compared to Title VII, *id.* at 1057-59, in arriving at the ultimate holding that "the ADEA precludes the assertion of age discrimination in employment claims, even those seeking to vindicate constitutional rights, *under § 1983*[,]" *id.* at 1057 (emphasis added). As such, the CPA overreads *Ahlmeyer*: the Ninth Circuit did not address preemption of *state* remedies. *See also Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1318

(9th Cir. 1982) ("[I]t is for Congress, not us, to decide whether state common law remedies trench too closely on the federal scheme.").

Nor is the ADEA's lack of an anti-preemption clause dispositive. Any Commonwealth cause of action would be preempted only where "it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990)).[4]

> Such an intent may be inferred from "a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Id.* (ellipses and brackets omitted) (quoting *English*, 496 U.S. at 79). In addition, "where federal law is said to bar state action in fields of traditional state regulation[, the Supreme Court has] worked on the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (brackets and ellipses omitted) (quoting *DeBuono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 n.8 (1997)). Prohibition of discrimination is an area of traditional state regulation. *Id.* at 981 (noting Washington's anti-discrimination statute "was enacted pursuant to the State's historic police powers to prohibit discrimination on specified grounds"); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 91 (2000) ("State employees are protected by state age discrimination statutes, and may recover money damages from their state employers, in almost every State of the Union."); *id.* at 94 n.2 (Stevens, J., concurring in part and dissenting in part) (noting "all 50 states had some form

[4] "Federal law may preempt state law under the Supremacy Clause in three ways," of which pervasive federal regulation is one. *Kroske*, 432 F.3d at 981. The other two "ways"—express statutory language of preemption and actual conflict between state and federal law, *id.*—are not implicated here.

of age discrimination law" at the time Congress amended the ADEA in 1974 to apply to public employers); *cf. City of Los Angeles v. AECOM Servs., Inc.*, 854 F.3d 1149, 1159 (9th Cir. 2017) ("States have historically regulated in the area of civil rights generally, and in the field of discrimination against disabled individuals specifically."). As such, the ADEA is presumed to not preempt state and local remedies absent the "clear and manifest" intent of Congress. *Kroske*, 342 F.3d at 981.

Such Congressional intent does not exist. In authorizing a private right of action, 29 U.S.C. § 626(c)(1), the ADEA specifically recognizes the existence of state laws "prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice" and forbids private actions "before the expiration of sixty days after proceedings have been commenced under the State law, unless such proceedings have been earlier terminated[.]" *Id.* § 633(b); *see also id.* § 633(a) (ADEA provisions are not to "affect the jurisdiction of any agency of any State performing like functions with regard to discriminatory employment practices on account of age" unless action is brought pursuant to ADEA). In other words, "[n]ot only does the ADEA disclaim any preemptive effect on state laws, 29 U.S.C. § 633(a), it also incorporates consistent state anti discrimination laws to serve as the primary enforcement mechanism of the enumerated rights, *see id.* §§ 626(d)(2), 633(b)." *Kroske*, 432 F.3d at 988. Therefore, the ADEA does not expressly or impliedly preempt a cause of action arising under Commonwealth law, as part of any Commonwealth anti-discrimination law consistent with the provisions of the ADEA.[5] *See also id.* at 987-89 (observing Washington's ban

---

[5] The Commonwealth, though not a State, is treated as a State under the ADEA because the ADEA, first enacted in 1967, (1) was in existence at the time section 502 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "Covenant") came into force, (2) is "applicable to Guam," and (3) is "of general application to the several States." Covenant § 502(a)(2), Pub. L. 94-241, 90 Stat. 263, 268 (1976) (reproduced at 48 U.S.C. § 1801 note); Proclamation No. 4534, 42 Fed. Reg. 56,593, 56,594 (Oct. 24, 1977) (providing January 9, 1978, as date

on age discrimination in employment was substantively identical to ADEA's provision and "plays an integral role in the enforcement of the federal anti-discrimination scheme"). Thus, the inquiry must turn to whether Commonwealth law recognizes Mr. Tudela's asserted cause of action.

The Commonwealth Code provides in relevant part:

> [T]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed[,] as generally understood and applied in the United States, shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary. . . .

7 CMC § 3401. "Section 3401 requires cautious application; courts must be vigil, since a survey of local law is necessary before resorting to the Restatement . . . ." *Tan v. Younis Art Studio*, 2007 MP 11 ¶ 14 (N. Mar. I. 2007). "In the Commonwealth, written law includes the NMI Constitution and NMI statutes, case law, court rules, legislative rules and administrative rules, as well as the Covenant and provisions of the U.S. Constitution, laws and treaties applicable under the Covenant." *Est. of Ogumoro v. Ko*, 2011 MP 11 ¶ 59 n.21 (quoting *Borja v. Goodman*, 1 N.M.I. 225, 242 (1990) (Villagomez, J., concurring in the judgment)). The Parties do not dispute that the Commonwealth has not enacted any statute prohibiting age discrimination in employment. Nor do the Parties identify any local customary law or any decisions of the Commonwealth Supreme

---

of entry into force of section 502); 29 U.S.C. § 630 (defining "State" to include, *inter alia*, Guam); *Salas v. United States*, 116 F.4th 830, 840-41 (9th Cir. 2024) (discussing application of section 502).

In any event, the Commonwealth possesses the general police power available to the States, within which includes the power to regulate and prohibit discrimination, subject to exceptions that are not relevant here. *See United States ex rel. Richards v. De Leon Guerrero*, Misc. No. 92-00001, 1992 WL 321010, at *35 (D. N. Mar. I. July 24, 1992) ("[T]he CNMI retains only a sovereignty similar to, but less than, that of the States (inasmuch as the Eleventh Amendment does not apply)."), *aff'd*, 4 F.3d 749 (9th Cir. 1993). Insofar the Commonwealth has not have actually exercised such power to enact anti-discrimination laws, "[t]he relevant question is whether a given area is one in which states have historically had the power to regulate, not whether states have previously regulated in the precise manner or to the degree that the federal government has chosen to regulate." *City of Los Angeles*, 854 F.3d at 1159.

Court bearing on constructive discharge in violation of public policy.[6] The CPA, however, identifies one case from the Commonwealth Superior Court—*Shiprit v. STS Enterprises, Inc.*, Civil Action No. 99-0490, 1999 N. Mar. I. Trial Order LEXIS 27 (N. Mar. I. Super. Ct. Dec. 13, 1999)—for the proposition that the "exception" to at-will employment "when a termination actively violates an important public policy" is treated "narrow[ly.]" (Def.'s Reply 7.)

In *Shiprit*, the Commonwealth Superior Court granted a motion to dismiss a complaint alleging wrongful termination of employment for failure to state a claim. *Shiprit*, 1999 N. Mar. I. Trial Order LEXIS 27, at *3, 12-13. The defendant there had sought dismissal because the plaintiff was an at-will employee at the time of termination; the plaintiff opposed on the ground that exceptions to the "employment 'at-will' doctrine" applied. *Id.* at *4. Noting that Commonwealth law had yet to address the doctrine, the Commonwealth Superior Court resorted to non-Commonwealth cases to describe the doctrine and its "three general exceptions":

> First, the public policy exception to the at-will doctrine permits an at-will employee to recover for wrongful discharge upon a finding that the employer's conduct undermined an important public policy. Second, an exception based on a contract law allows an at-will employee to recover for wrongful discharge upon proof of an implied-in-fact promise of employment for a specific duration. . . . Third, courts have found an implied-in-law covenant of good faith and fair dealing in employment contracts and have held employers liable in both contract and tort for breach of this covenant.

*Id.* at *6 (quoting *Huey v. Honeywell, Inc.*, 82 F.3d 327, 331 (9th Cir. 1996)).

*Shiprit* is of no moment. First, the remainder of *Shiprit* did not address the "public policy

[6] In *Bisom v. Commonwealth*, 2002 MP 19 (N. Mar. I. 2002), the plaintiff raised a series of claims arising from his termination for cause, including a claim for wrongful discharge. 2002 MP 19 ¶ 6. The Commonwealth Supreme Court did not address the claim specifically as the issues on appeal were limited to alleged trial court errors in denying admission of the plaintiff's lost-income calculation, limiting the plaintiff's closing argument, and denying the plaintiff's request for indemnification by the Commonwealth government. *Id.* ¶ 2. Thus, *Bisom* does not clarify the requirements for a wrongful discharge claim generally or the particular variant Mr. Tudela asserts in his Complaint.

exception" as the plaintiff did not assert that the exception applied to the facts there. *Shiprit*, 1999 N. Mar. I. Trial Order LEXIS 27, at *6. Thus, at best, *Shiprit* reflects a presumption that a wrongful discharge cause of action *generally* is cognizable under Commonwealth law; the particular requirements of an action for wrongful discharge *in violation of public policy* remain undefined. Second, and critically, decisions of the Commonwealth Superior Court are not binding pronouncements of Commonwealth law. *Bank of Saipan v. Super. Ct.*, 2001 MP 7 ¶ 21 (N. Mar. I. 2001). Thus, even if *Shiprit* had touched upon wrongful discharge in violation of public policy, *Shiprit* is not "written law" of Commonwealth for the purposes of 7 CMC § 3401.[7] *Cf. also King*

---

[7] Two other decisions of the Commonwealth Superior Court set forth the elements for wrongful discharge in violation of public policy but do not shed any light on whether such a claim would be foreclosed by the existence of a comprehensive remedial statute. In *Sablan v. Manglona*, Civil Action No. 04-0166, 2006 N. Mar. I. Trial Order LEXIS 22 (N. Mar. I. Super. Ct. Feb. 27, 2006), the Commonwealth Superior Court, citing Washington and Ohio decisions, enunciated a four-element formulation:

> [C]ourts have employed a four-step test for determining if the tort applies. Under this test, the plaintiff must prove that (1) there is a clear public policy (clarity element); (2) discouraging the conduct in which he or she engaged would jeopardize the public policy (jeopardy element); (3) the public-policy-linked conduct caused the dismissal (causation element); and (4) there is no overriding justification for the dismissal (absence of justification element).

*Sablan*, 2006 N. Mar. I. Trial Order LEXIS 22, at *4-5 (citing *Hubbard v. Spokane Cnty.*, 50 P.3d 602, 606 (Wash. 2002), and *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1999)). Subsequently, in *Ayuyu v. Mendiola*, Civil Action No. 120051, 2012 N. Mar. I. Trial Order LEXIS 43 (N. Mar. I. Super. Ct. Nov. 4, 2012), the Commonwealth Superior Court quoted the elements as set forth in *Sablan* before clarifying that "[t]he source of public policy for a wrongful termination action based on a violation of public policy must derive from constitutional or statutory authority[,]" 2012 N. Mar. I. Trial Order LEXIS 43, at *4 n.3 (citing *Green v. Ralee Eng'g Co.*, 960 P.2d 1046, 1048 (Cal. 1998)), surveyed non-Commonwealth cases concerning the unlawfulness of "discharg[ing] a public employee in retaliation for speaking out on issues of public concern," *id.* at *9 (footnote omitted), and relied on non-Commonwealth cases, the Restatement (Third) of Agency, and another Commonwealth Superior Court decision (*Atalig v. Rota Municipal Council*, Civ. No. 04-0012 (N. Mar. I. Super. Ct. May 9, 2005) (findings of fact and conclusions of law)) in holding that all participants in the alleged wrongful termination, and not only the employer, may be held personally liable, *id.* at *10-16.

As with *Shiprit*, *Sablan* and *Ayuyu* are of no moment in assessing whether Commonwealth law is silent on a subject owing to the decisions' lacking status as binding pronouncements of Commonwealth

*v. Order of United Com. Travelers of Am.*, 333 U.S. 153, 161 (1948) (finding state trial court decisions were not binding on federal court where, *inter alia*, state trial court's decisions were not binding on other parties, later cases, or same or lesser courts within its territorial jurisdiction). Accordingly, the Court must still "resort[] to the Restatement[,]" *Tan*, 2007 MP 11 ¶ 14, and if necessary, decisions reflecting how the relevant law is "generally understood and applied in the United States," 7 CMC § 3401, because Commonwealth law is silent as to the exact requirements for an action for wrongful discharge in violation of public policy and whether, as urged by the CPA, such claim is foreclosed by the existence of a comprehensive statutory remedial regime.

Since *Shiprit*, the American Law Institute has published a Restatement of Employment Law. As such, under the plain language of 7 CMC § 3401, the Court turns to that Restatement first to ascertain if it addresses the relevant issues. *See Est. of Ogumoro*, 2011 MP 11 ¶¶ 61, 64 (construing 7 CMC § 3401 as "incorporat[ing] the entire body of Restatements" and holding that "the Restatements are the operative rules of decision in the Commonwealth, even when the relevant provision does not accord with United States common law"); *cf. Salty Saipan Corp. v. Shakir*, 2018 MP 18 ¶ 12 (N. Mar. I. 2018) ("When there are multiple restatements available, courts

---

law. In any event, both decisions also do not address the impact of the existence of a comprehensive remedial statute.

This Court in *Gray*, quoting *Chung v. World Corp.*, No. CV-04-0001-ARM, 2005 WL 1459674, at *4 (D. N. Mar. I. June 22, 2005), set forth a five-element formulation. *Gray*, 2023 WL 3714156, at *8 ((1) public policy must exist; (2) employee was "engaged in conduct favored by public policy"; (3) employer "knew or believed that the employee was engaged in a protected activity"; (4) "retaliation was a motivating factor in the dismissal decision"; and (5) employee's discharge "would undermine an important public policy"). However, *Gray* and *Chung*, as decisions of a federal court ascertaining and applying existing local law, are not binding pronouncements of Commonwealth law. *Cf. AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136-41 (9th Cir. 2024) (declining to follow prior four-decade-old federal appellate precedent interpreting California law, even absent decision of California Supreme Court, where intervening California intermediate appellate decisions uniformly rejected the federal appellate precedent's reasoning). And as with the Commonwealth Superior Court decisions, *Gray* and *Chung* do not address whether a wrongful discharge claim would be foreclosed by the existence of a comprehensive remedial statute.

should adopt the newer restatement if the new version represents the current majority common law rule.").[8] The Restatement of Employment Law provides in relevant part:

> An employer that discharges an employee because the employee engages in activity protected by a well-established public policy as described in § 5.02 is subject to liability in tort for wrongful discharge in violation of public policy, *unless the statute or other law forming the basis of the applicable public policy precludes tort liability or otherwise makes judicial recognition of a tort claim inappropriate.*

RESTATEMENT OF EMP. L. § 5.01 (AM. L. INST. 2015) (emphasis added). As such, the elements of a claim for wrongful discharge in violation of public policy are: (1) an employer discharges an employee; (2) the employee was engaged in activity; (3) such activity was protected by well-established public policy;[9] and (4) the discharge was based on the employee's engaging in such

---

[8] It thus appears that based on the language of 7 CMC § 3401 and *Estate of Ogumoro*, when the American Law Institute publishes a restatement in a new area of law (as here), such restatement would automatically supersede all existing non-binding decisions ascertaining Commonwealth law—through recourse to the decisions of courts among the States, *e.g.*, *Sablan*'s quoting of a Washington Supreme Court decision in enunciating the elements of a claim for wrongful discharge in violation of public policy; *Gray* and *Chung*'s reliance on *American Jurisprudence, Second Edition*—in that area of law.

At the hearing on the CPA's Motion, Mr. Tudela's counsel correctly highlighted that the CPA raised the applicability of the Restatement of Employment Law for the first time in its Reply and requested an opportunity to brief whether 7 CMC § 3401's apparent delegation of lawmaking authority to the American Law Institute violated the separation of powers (presumably under the Covenant and Commonwealth Constitution). The Court denies the request in view of the Commonwealth Supreme Court's consistent, unbroken application of 7 CMC § 3401 and resort to the various restatements of the law to ascertain the "common law" when no written Commonwealth law is available. *See Est. of Ogumoro*, 2011 MP 11 ¶¶ 63 & n.23 (collecting cases).

[9] The Restatement describes protected activities as follows:

> An employer is subject to liability in tort under § 5.01 for discharging an employee because the employee, acting in a reasonable manner:
>
> > (a) refuses to commit an act that the employee reasonably and in good faith believes violates a law or other well-established public policy, such as a professional or occupational code of conduct protective of the public interest;

protected activity. The accompanying commentary on common-law claims being precluded or otherwise inappropriate explains:

> Even if no statute expressly precludes parallel common-law actions, courts must determine whether it is appropriate to recognize a parallel public-policy tort action. Some courts describe this determination as an examination of the implied intent of the legislature. *It is often more realistic to frame the inquiry as whether it is appropriate under the common law to recognize an additional cause of action when a statute addresses the same subject matter*, rather than as an elusive search for implied legislative intent.
>
> Judicial reluctance to recognize a common-law claim when a statute offers some protection regarding the same public policy stems from two principal concerns. One is that the legislature, in addition to identifying the public policy at issue in the statutory enactment, may have also chosen a specific, perhaps limited, remedy to protect that public policy. The statutory remedy may reflect compromises between competing interests that are better handled in a legislative, as opposed to a judicial, forum. A second consideration is that the statutory remedy may adequately address the interests of the injured

---

> (b) performs a public duty or obligation that the employee reasonably and in good faith believes the law imposes;
>
> (c) files a charge or claims a benefit in good faith under an employment statute or law, whether or not the charge or claim is meritorious;
>
> (d) refuses to waive a nonnegotiable or nonwaivable right when the employer's insistence on the waiver as a condition of employment, or the court's enforcement of the waiver, would violate well-established public policy;
>
> (e) reports or inquires about conduct that the employee reasonable and in good faith believes violates a law or an established principle of a professional or occupational code of conduct protective of the public interest; or
>
> (f) engages in other activity directly furthering a well-established public policy.

RESTATEMENT OF EMP. L. § 5.02; *see also id.* cmt. h (explaining that subsection (f) was intended to accommodate for "[s]ome wrongful discharges" that "do not easily fit into [subsections (a) through (e)] and yet harm third parties and the public in a substantial way"). In defining the "[s]ources of public policy for the tort of wrongful discharge in violation of public policy under § 5.01[,]" *id.* § 5.03, the Restatement goes beyond *Sablan* and *Ayuyu* by including sources beyond constitutional and statutory authority, *see id.* § 5.03(c), (d).

> employee and properly vindicate the relevant public policy, making additional remedies and their costs unnecessary. *If a statute provides an adequate alternative remedy, courts are less likely to recognize a common-law public-policy cause of action based on violations of that statute.*
>
> Courts consider a variety of factors in determining whether to recognize a common-law claim based on the public policy in a statute. Some factors are whether the employee has a private cause of action under the statute and, if not, whether the employee can appeal the administrative body's decision to the courts; whether the statute establishes a comprehensive regulatory scheme; the importance of the relevant public policy; whether the public policy is expressed in sources other than the statute; and what the polices are behind any procedural restrictions to pursuing the statutory claim.
>
> *Comprehensive antidiscrimination statutes, even if they do not expressly preclude additional remedies, are a clear example of the kind of statute that courts are reluctant to supplement with a parallel common-law action for wrongful discharge in violation of public policy*. Many state statutes, *as well as Title VII of the Civil Rights Act of 1964*, prohibit employers from discriminating on the basis of race, color, sex, religion, national origin, or other protected characteristics. These statutes, embodying a public policy of the highest order, often do not expressly preclude common-law or other claims. *Nevertheless, because such antidiscrimination statutes are comprehensive in scope and provide adequate and appropriate remedies, courts generally decline to recognize a common-law tort action for wrongful discharge in violation of a public policy when the discharge is on a ground the statutes prohibit.*
>
> [. . .]
>
> In contrast, courts are more willing to recognize supplementary common-law remedies for statutes that do not provide injured employees either a private cause of action or other remedies. An example is the federal Occupational Safety and Health Act of 1970 (OSHA).

*Id.* cmt. e (emphasis added). The CPA correctly characterizes the ADEA as providing "a remedial scheme capable of vindicating" the public policy against age discrimination in employment. (Def.'s Reply 6.) *See Zombro v. Balt. City Police Dep't*, 868 F.2d 1364, 1366, 1369 (4th Cir. 1989) ("The ADEA provides a comprehensive statutory scheme to prohibit discrimination in

employment on the basis of age. . . . An examination of the Act reveals that it is a precisely drawn, detailed statute, similar to other statutory schemes which have been held to provide the exclusive judicial remedy for a stated abuse . . . ."); *Ahlmeyer*, 555 F.3d at 1056-57 (adopting reasoning of *Zombro* in holding ADEA precluded claim under 42 U.S.C. § 1983); *id.* at 1058 ("We are unable to perceive . . . a constitutional claim for age discrimination that is not vindicated fully by the ADEA."). Furthermore, "[i]n its substantive provisions, the ADEA mirrors Title VII . . . ." *Ahlmeyer*, 555 F.3d at 1059. If the Restatement expressly identifies Title VII as a statute precluding recognition of a common-law action for wrongful discharge in violation of public policy, RESTATEMENT OF EMP. L. § 5.01 cmt. e, then the ADEA should similarly preclude such a common-law action. The differences between the ADEA and Title VII—namely, the ADEA's narrower scope and more limited remedies, *Ahlmeyer*, 555 F.3d at 1059—do not compel a contrary conclusion because such distinctions reflect the relevance of age, as opposed to the characteristics protected under Title VII, to an "individual's capacity to work," *id.* (citing *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005)), the lesser occurrence of intentional discrimination on the basis of age as compared to discrimination on the bases protected by Title VII, *id.* (citing *Smith*, 544 U.S. at 241), and Congress's intent to "facilitate and encourage compliance" with anti-age-discrimination mandates at the workplace "through an informal process of conciliation and mediation[,]" *id.* (quoting *Zombro*, 868 F.2d at 1366); *see also* RESTATEMENT OF EMP. L. § 5.01 cmt. e ("[T]he legislature, in addition to identifying the public policy at issue in the statutory enactment, may have also chosen a specific, perhaps limited, remedy to protect that policy.").

As such, Mr. Tudela's common-law claim for wrongful discharge in violation of public policy is not cognizable under Commonwealth law because the ADEA, "embodying a public policy of the highest order," is "comprehensive in scope and provide[s] adequate and appropriate

remedies[.]" RESTATEMENT OF EMP. L. § 5.01 cmt. e. Consequently, no further pleading by Mr. Tudela could change the conclusion that his common-law claim is foreclosed as a matter of law. Therefore, Mr. Tudela's second count should be dismissed without leave to amend. *Lopez*, 203 F.3d at 1130.

**C. Remedies**

The CPA contends that Mr. Tudela's prayer for damages for emotional distress and punitive damages must be dismissed because such remedies are unavailable under the ADEA. (Def.'s Mem. 10-11.) Mr. Tudela misreads the CPA's arguments as urging dismissal of the entire ADEA claim should any one of his prayed-for damages be unavailable. (Pl.'s Opp'n 13; *see also* Def.'s Reply 10-11.) The CPA is correct.

The Ninth Circuit has explained:

> Compensatory damages for pain and suffering and punitive damages are not available under the ADEA, which employes its complex enforcement scheme "to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621. Relief under the ADEA is limited to "judgments compelling employment, reinstatement, or promotion," the recovery of unpaid minimum wages or overtime pay, and reasonable attorneys' fees and costs. *See* 29 U.S.C. §§ 216(b), 626(b).

*Ahlmeyer*, 555 F.3d at 1059; *see also Cancellier*, 672 F.2d at 1317 n.4 (noting that "award of liquidated damages is in effect a substitute for punitive damages and is intended to deter intentional violations of the ADEA"). As such, Mr. Tudela's prayer for emotional distress and punitive damages must be dismissed without leave to amend because they are unavailable as a matter of law. *Lopez*, 203 F.3d at 1130; *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (observing that striking of type of damages due to unavailability as matter of law is properly done by Rule 12(b)(6) motion dismissing portions of complaint seeking precluded damages).

## IV. CONCLUSION

Mr. Tudela's Complaint states a plausible claim for relief under the ADEA. However, Mr. Tudela's common-law claim for wrongful discharge in violation of public policy is foreclosed as a matter of Commonwealth law. Furthermore, damages for emotional distress and punitive damages are unavailable as a matter of law under the ADEA. Accordingly,

(1) The CPA's Motion to Dismiss (ECF Nos. 8, 9-1, and 9-2) is GRANTED IN PART and DENIED IN PART, to wit:

   a. The CPA's Motion to Dismiss is DENIED as to the first count of Mr. Tudela's Complaint;

   b. The CPA's Motion to Dismiss is GRANTED as to the second count of Mr. Tudela's Complaint; and

   c. The CPA's Motion to Dismiss is GRANTED as to the prayer for damages for emotional distress and punitive damages in Mr. Tudela's Complaint;

(2) The second count of Mr. Tudela's Complaint is DISMISSED WITHOUT LEAVE TO AMEND; and

(3) The prayer for damages for emotional distress and punitive damages in Mr. Tudela's Complaint is DISMISSED WITHOUT LEAVE TO AMEND.

IT IS SO ORDERED this 13th day of October, 2026.

**/s/ Frances M. Tydingco-Gatewood**
**Designated Judge**
**Dated: Oct 13, 2026**